## McEnroe, Appellant, *v.* McEnroe.

*Will—Issue devisavit vel non—Undue influence—Bequest to Roman Catholic priest.*

A will will be sustained where the testimony shows that at the time of the making of the will, which was immediately prior to testator's death, testator was sixty-nine years old and of perfectly sound mind; that his next of kin were two nephews and a neice not mentioned in the will; that the two nephews were strangers to him; that the chief beneficiary in the will was the proponent, who was a second cousin of testator, and a Roman Catholic priest; that there had never been any relation of priest and parishioner between proponent and testator, but only one of long companionship and close friendship; that when the testator was in his last illness he sent for proponent; that a few days before testator's death proponent and another priest went to the testator, and the other priest administered to him the last sacrament, and at this time proponent asked the testator if he had made his will, and receiving a negative reply, advised him to do so; that at testator's solicitations deponent wrote down the outlines of the will as testator dictated it, and from these notes a reputable attorney at law prepared the will which was executed in the presence of this attorney and another reputable attorney, with neither of whom had the proponent any previous acquaintance.

On the trial of an issue devisavit vel non it will not be presumed from the fact that the bulk of the estate is given to a Roman Catholic priest, that the gift was in reality for religious uses.

Argued Jan. 6, 1902. Appeal, No. 73, Jan. T., 1901, by plaintiff, from judgment of C. P. No. 1, Phila. Co., June T.,

1900, No. 999, on verdict for defendant in case of Philip McEnroe, Executor and Trustee of the Estate of William Baugh, Deceased, Francis Aidan Brady, Daniel McDermott, Philip McEnroe and Maggie McMahon, v. Matthew McEnroe, Catherine McEnroe and Peter McEnroe. Before McCOLLUM, C. J. MITCHELL, DEAN, FELL, BROWN, MESTREZAT and POTTER, JJ. Reversed.

Issue devisavit vel non. Before BRÉGY, J.
The facts are stated in the opinion of the Supreme Court.

*Error assigned*, amongst others, was in submitting the case to the jury.

*Alex. Simpson, Jr.*, with him *John T. Greene* and *J. Davis Brodhead*, for appellant.—The rule that undue influence is to be presumed where the testator is of weak mind and the scrivener takes a large benefit applies only to the case of a stranger: Caldwell v. Anderson, 104 Pa. 199 ; Blume v. Hartman, 115 Pa. 32 ; Logan's Est., 195 Pa. 282 ; Scattergood v. Kirk, 195 Pa. 195.

A man has a right by fair argument or persuasion to induce another to make a will, and even to make it in his own favor: Miller v. Miller, 3 S. & R. 267.

A will procured by circumvention will be set aside, but a will procured by honest means, by acts of kindness, attention and by importunate persuasion which delicate minds would shrink from, will not be set aside on this ground alone: Zimmerman v. Zimmerman, 23 Pa. 378 ; Daniel v. Daniel, 39 Pa. 191 ; Tawney v. Long, 76 Pa. 106 ; Wainwright's Appeal, 89 Pa. 223 ; Trost v. Dingler, 118 Pa. 259 ; Englert v. Englert, 198 Pa. 331 ; Hoge's Will, 2 Brewster, 451 ; Boyd v. Boyd, 66 Pa. 291 ; Merrill v. Rolston, 5 Redf. 220 ; Dean v. Negley, 41 Pa. 317.

*Maurice W. Sloan*, for appellees.—The burden is on Father McEnroe to prove that this will is the free will of William Baugh : Cauffman v. Long, 82 Pa. 72 ; Harrison's Appeal, 100 Pa. 470 ; Boyd v. Boyd, 66 Pa. 283 ; Cuthbertson's Appeal, 97

Pa. 163; Wilson's Appeal, 99 Pa. 545; Armor's Est., 154 Pa. 517; Douglass's Appeal, 162 Pa. 567; Smith's Est., 34 W. N. C. 103; Erwin's Est., 35 W. N. C. 477; Scattergood v. Kirk, 192 Pa. 263.

The relation of a spiritual ruler is of such a confidential nature and one of such inequality that the courts watch it most carefully: Harrison's Appeal, 100 Pa. 470; Wilson v. Mitchell, 101 Pa. 495; Armor's Appeal, 154 Pa. 517; Douglass's Appeal, 162 Pa. 567; Caven v. Agnew, 186 Pa. 314; Kirk v. Scattergood, 192 Pa. 263; Logan's Estate, 195 Pa. 282.

OPINION BY MR. JUSTICE DEAN, February 24, 1902:

William Baugh, the testator, was a native of Ireland, sixty-nine years of age; he had come to this country when a young man, where, by industry and thrift he had accumulated an estate to the value of about $60,000; he had been married but had been divorced for many years, and had no children; his next of kin were two nephews and a niece, these appellees; the appellant Rev. Philip McEnroe is a second cousin of testator. Testator resided all his American life at Philadelphia. He was a Catholic in religion and lived within the bounds of St. Mary's parish, Philadelphia, but having taken offense in some dispute with the priest in charge, seems to have given very little attention to religious duties for some years before his death. All his life, previous to his last illness he was in good health physically and mentally. In the spring of 1899, he fell sick of what was first supposed to be rheumatism and went to Atlantic City hoping to be relieved, but getting no better his physician recommended country air; he then removed to Media, Delaware county, and became a boarder at the Charter House hotel in that town about the middle of August, 1899. He called in Dr. Fronefield of that place as his physician, who soon pronounced his disease cancer of the stomach and that he was rapidly failing. On his being informed of his serious condition he sent a request to his cousin, Father McEnroe, who lived at Bethlehem, to visit him, which request the cousin obeyed and called on him August 18, following; the same day McEnroe returned home. The relations between testator and this cousin were of a very friendly character; they were

not only blood relations but congenial companions; for thirty years they had visited each other, at least once a month and had enjoyed each other's hospitality. After August 18, testator continued to. grow worse of which Father McEnroe was notified; on September 7, following, he again visited his cousin, but lodged at the house of Father Brady, the parish priest at Media. During the night testator had severe hemorrhages and grew so much worse, as to alarm the attendant nurse, who went early in the morning to the house of Father Brady and told both him and Father McEnroe of the danger and also gave notice to Dr. Fronefield. McEnroe and the doctor met at the house soon after, where Baugh was in bed and the doctor informed the sick man that he would soon die. Father Brady had no personal acquaintance before this with Baugh and at his, Brady's request, Father McEnroe with some protest, took the confession of the sick man and Brady administered the last sacrament. McEnroe asked the testator if he had made his will, and receiving a negative reply, advised him to do so; the testator then asked McEnroe to draw up a will; the latter objected, but finally yielded to Baugh's solicitations and wrote the outlines of a will for him as Baugh suggested. In this will, he gives to one Maggie McMahon $1,000, to Father Brady $50.00, to Father McDermott of St. Mary's Catholic Church, Philadelphia, $500, and to Father McEnroe in trust for his niece Catherine McEnroe $5,000, the interest to be paid to her annually during her life and at her death the principal to her issue, with the discretion to his executor to pay to her the whole or any part of the principal. All the rest and residue of his estate he gave to his cousin Rev. Philip McEnroe absolutely and appointed him executor and trustee of the will. This was not the final writing signed; the last will was rewritten from the notes made by Father McEnroe, by Frank B. Rhodes, Esq., a lawyer with an office in Media and the executed will is substantially the same as the one set out in the McEnroe notes.

It will be noticed, that testator gives nothing to the two nephews and but $5,000 to the niece, while he gives to the cousin McEnroe, approximately, $50,000. Of course; the nephews and niece were dissatisfied and instituted this contest. On a preliminary hearing before the orphans' court an issue was awarded

by that court and certified to the common pleas for trial. The issue propounded the three inquiries to be answered in the latter court:

1. Whether at the time he made his will the testator was of sound mind?

2. Whether the will was procured by undue influence on the part of Rev. Philip McEnroe and other persons?

3. Whether the writing purporting to be the will of the testator was his will?

As to the first and third interrogations, there was practically no evidence bearing upon them. Testator was unquestionably, of sound and disposing mind when he made the will and he unquestionably intended to sign and in strict conformity with the statute did publish the writing for his last will and testament. The issue turned alone on the second interrogatory. Was the will procured by the undue influence of Philip McEnroe?

In our rulings as to what constitutes undue influence by one who advised or drew the will and is a large beneficiary under it, we have followed pretty closely Boyd v. Boyd, 66 Pa. 283, and that case commends and adopts as the law the text of Redfield on Wills, 529; it speaks thus : " Undoubtedly, if the counsel for an old man, whose mental faculties are impaired though not destroyed by advanced age, should draw for him a will, giving to himself the bulk of his estate, or a very considerable part of it, it would not be enough to show the formal execution of the paper in the presence of two subscribing witnesses called in for that purpose." And further says Judge REDFIELD : " The existence of the fiduciary relation does not annul the testamentary act in favor of the attorney by his client; but such fact calls for watchfulness lest some improper influence may have been exercised. There should be very clear evidence of mental capacity and proof independent of the factum, that the mind free and unbiased accompanied the act." In this case, for the purpose of review, we assume with the court below, that the relation between the testator and his cousin was a confidential one closely allied to that of counsel and client, though that fact is not altogether clear. The cousin was a priest of the Roman Catholic church, and testator was a member of that church; but they lived in wholly different parishes; there is no evidence that testator was ever

inside his cousin's church, either at mass or confession ; the relation at least up until a few days before Baugh's death, was not a spiritual one, conferring on the priest the office of adviser and teacher by church authority. It seems to have been one alone of companionship and close friendship having for its beginning kinship and acquaintance among strangers, in a foreign country. If the case ought to have gone that far, perhaps the nature of the relation would have been a question for the jury ; but as before noticed, for our present purpose, we will presume the relation was a confidential one and will so treat it. The cousin was a large beneficiary under the will ; but giving Redfield on Wills and Boyd v. Boyd their full force, that fact of itself, does not annul the testamentary act, it only calls for watchfulness, lest some improper influence may have been exercised. In other words, it casts upon the beneficiary the burden of showing the will was prompted by the testator's own mind free from undue influence. Here, one of the most significant facts tending to show undue influence is wholly absent ; there was no impairment of the mental powers ; no clouding of intelligence ; there is a bare scintilla of evidence on the part of two or three witnesses, that testator's illness, in their opinion, had weakened his mind, but the very facts cited by them as ground for the inference, show flatly the contrary ; the overwhelming weight of the evidence shows, that his perceptions were as acute as ever, and that the business capacity which had enabled him to accumulate a considerable fortune existed in full measure when he came to dispose of it by will ; he enumerated twenty-nine different pieces of real estate ; specified the amount of his money on hand ; told of the amount and nature of his other personal property ; gave his reasons for his bounty to one and why he gave nothing to another ; sufficient reasons too, to most men though not always so bluntly expressed. The evidence does not raise, even a doubt, as to his full mental capacity ; if any undue influence was exercised over him, it was over a man of superior business ability in the full enjoyment of his mental faculties.

But it is argued, that under the law, the presumption of undue influence still exists ; that the beneficiary must go further, than merely showing, that a man of sound mind made a will properly attested, in his favor. What could he show more

than he has shown? The favored legatee is not a stranger in blood, is connected by the closest ties of many years of friendship and companionship, and of all Baugh's acquaintances this priestly cousin seems to have been the only one with whom he was confidential. All his other relatives, except the one niece, were strangers to him; what more natural, than that he should desire to leave to this one favorite cousin the bulk of his estate rather than distribute it among nearer kindred who to him were strangers? To prove that no undue influence was exercised by him, he simply narrates the facts, and his narration, so far as corroboration is possible, is fully corroborated by the lawyer who drew the will, the witnesses who attested it and by the stranger priest who officiated in the parish where he died. The cousin suggested, that he make a will; what more reasonable suggestion could have been made to a man of precarious health, with none but collateral relatives who were strangers. He emphatically denies, that he suggested the provisions of the will and told him it was his, Baugh's, will not his, McEnroe's, that was to be drawn. While he took notes of the wishes of the testator, the will was drawn by a reputable lawyer who was wholly indifferent; he had not even met the favored cousin before the will was drawn; then accompanied by another reputable lawyer, he visited testator in his room, fully made known its provisions to him, which he fully understood and assented to; the cousin, a great part of the time was not even in the room. In fact, that watchfulness, which Judge REDFIELD suggests, and which Justice SHARSWOOD in Boyd v. Boyd approves, fails to detect the least unfairness toward testator, or the least domination of his mind in a single circumstance connected with the transaction. By the rule adhered to, where a confidential relation between the testator and beneficiary has been shown, and that the latter was also the scrivener who drew the will, the burden is on the beneficiary to show testamentary capacity and a full knowledge on the part of testator of the nature of his act; but this rule must have a reasonable construction, or rather it must have a reasonable application, in view of the circumstances of the particular case. If the beneficiary here, had been a comparative stranger to the testator, the presumption would have been stronger against him; but instead of there being no apparent reason why McEnroe

should have been the object of his bounty, there was a strong reason why he should be; then, no negative testimony rebutting falsehood, deception or overreaching was called for, because a simple narration of the circumstances from beginning to end, disclosed nothing of the kind; all was seemingly fair and natural, judging men by their ordinary motives and conduct. To show this, was the extent of the burden which the law cast on the proponent; he was not bound to go further and object to the generosity of his cousin, nor was he bound to urge that the other collateral relatives should be more favorably considered; he could accept with a clear conscience, that which the testator was free to bestow. Nor is the argument, or rather the insinuation running through the argument of appellee, that this although ostensibly a gift to an individual, is really a gift to a priest by a dying man, for religious uses, of any weight. It is not a question involved in the issue here framed. The will expressly says, the gift is to Rev. Philip McEnroe; what may have been the unexpressed wishes or expectations of the donor we do not know. In his last days the testator may have hoped to placate Heaven by a gift to the priest of the church to which he belonged; if so, it was his right to do so; the many last wills which come before us for review, show, that it is very common for members of all Christian churches, Catholic and Protestant, to make large donations for religious purposes; the donors have a right to give their property for such purpose as pleases them, and neither kindred, direct or collateral, have a right to complain.

We are all of opinion, that this verdict has no evidence to sustain it and ought to be set aside. The judgment is reversed and issue dismissed.